# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Cr. No. 2:22-cr-32 |
| | ) | |
| v. | ) | MOTION TO SUPPRESS |
| | ) | |
| ALONZO MARKELL JENKINS | ) | |

The Defendant Alonzo Jenkins, through his undersigned attorney, respectfully moves this Court to suppress all evidence obtained as a result of the stops, searches, and seizures which resulted in the indictment against him. The basis for this motion is that the evidence was obtained in violation of his rights under the Fourth, Fifth, and Sixth Amendments of the United States Constitution.

The indictment alleges events that took place on three separate days: April 11, 2019, April 16, 2020, and November 4, 2020. Mr. Jenkins is charged with 3 counts of violating federal law for each date. Mr. Jenkins, for each event, was reportedly stopped for a motor vehicle/traffic violation under South Carolina state law. Mr. Jenkins denies that he committed such violations.

    **I. Counts 1, 2, and 3.**

Counts 1, 2, and 3 of the indictment charge that on April 11, 2019 the Defendant knowingly possessed a firearm and ammunition, knowingly possessed with intent to distribute crack cocaine

and methamphetamine, and used, carried, and possessed a firearm during and in relation to and in furtherance of a drug trafficking crime.

### A. Statement of Facts

On April 11, 2019, Dorchester County Sheriff's Deputy James Murphy conducted a traffic stop on a Chevrolet Camaro. The officer turned on his blue lights and the car pulled over into a driveway, onto private property. The deputy claimed that the car disregarded a stop sign at Oakmont and Pinewood Street in Ladson, South Carolina. Alonzo Jenkins was the driver and Jokashia Pedraza was a passenger. There is no dash cam recording of the traffic violation or the stop. At 7:22 pm, when the officer approached the stopped car, he turned on his body camera. At that point the car and Mr. Jenkins were seized, since neither he nor the car were free to leave. *Rodriguez v. United States,* 575 U.S. 348, 354, 135 S.Ct. 348 (2015). Mr. Jenkins' car was blocked in, and he could not walk or drive away.

The officer told Mr. Jenkins that he was stopped because he didn't stop at a stop sign. Mr. Jenkins responded that he thought he did stop. The officer admitted that he did see Mr. Jenkins hit his brakes but that the car did not come to a complete stop. Mr. Jenkins was asked for and provided his driver's license. He was driving his brother's car and looked for the car registration. He called his brother and asked him for proof of insurance since he couldn't find it. His brother was going to send it via a screen shot on his cell phone. The officer said he would accept that. The officer did not wait for the screen shot to be transmitted.

Deputy Murphy claimed he could smell the odor of marijuana. Mr. Jenkins stated he had only been smoking cigarettes. He had a pack of cigarettes next to him.

Deputy Murphy claimed that the smell gave him probable cause to search Mr. Jenkins, Ms. Pedraza, and the vehicle. Deputy Murphy kept Mr. Jenkins' driver's license. He asked him to step out of the car.

He did not pat down Mr. Jenkins as he stood against the car with his hands up. Instead, he went inside Mr. Jenkins' pockets and pulled everything out of each pocket. He asked Mr. Jenkins if he had anything that would poke, cut, or stick him. Mr. Jenkins said he had a closed pocketknife. The Deputy said that was fine, he had one too. The Deputy found a small pocketknife.

Deputy Murphy also found a tiny bag with a white substance in the front left pants pocket. Thereafter Mr. Jenkins was handcuffed and moved away from the car.

The car was searched. A Smith and Wesson pistol was found in a pack behind the passenger seat. A black plastic container containing a plastic bag was found, with .39 grams of marijuana. A small amount of methamphetamine tablets and an additional amount of cocaine base was also found. None of these items were in plain view.

### B. Statement of Law

The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U. S. Const. amend IV. This right limits the power of law enforcement officers to conduct searches of places in which a person has a legitimate expectation of privacy. *Rakas v. Illinois*, 439 U.S. 128, 143 (1978). Warrantless searches are per se unreasonable unless the search falls within a valid exception. *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). Because

warrantless searches are presumptively unlawful, the burden of proving that one of the valid exceptions to the warrant requirement has occurred, as well as the overall burden of proof, rests with the government. *United States v. Jeffers*, 342 U.S. 48 (1951).

Initially, the defendant must show that there was no warrant for the search or arrest. There is no dispute that Deputy Murphy did not have a warrant to stop, arrest or search the Defendant or the car.

Therefore, the government must show by a preponderance of the evidence that the warrantless search was justified under one of the narrow exceptions to the rule requiring a search warrant. *Chimel v. California*, 395 U.S. 752 (1969). If the government alleges that the Defendant consented to the search, it also has the burden of proving such consent. *Bumper v. North Carolina*, 391 U.S. 543 (1968). The Defendant denies that he gave consent.

To stop someone, even for investigatory purposes, an officer must possess "a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119 (2000). Temporary detention of individuals during a traffic stop by the police, even if only for a brief period and for a limited purpose, is a seizure. *Whren v. United States*, 517 U.S. 806, 809 (1996). "An automobile stop is thus subject to the constitutional imperative that it not be 'unreasonable' under the circumstances." *Id.*

> Reasonable suspicion to initiate a brief investigative traffic stop requires a particularized and objective basis for suspecting the particular person stopped of criminal activity." Although it is a "commonsense, nontechnical" standard, to support a finding of reasonable suspicion the detaining officer must 'either articulate why a particular behavior is suspicious or logically demonstrate, given the surrounding circumstances, that the behavior is likely to be indicative of some more sinister activity than may appear at first glance. In practice, this typically

4

means that "an officer's articulated facts must in their totality serve to eliminate a substantial portion of innocent travelers before reasonable suspicion will exist."

*United States v. Feliciana*, 974 F.3d 519, 523 (4th Cir. 2020)(internal citations and quotation marks omitted).

The Supreme Court has recognized that a limited stop and frisk of an individual could be conducted without a warrant based on less than probable cause. *Terry v. Ohio*, 392 U.S. 1 (1968). A *Terry* stop must be predicated on a reasonable, individualized suspicion based on articulable facts, and the frisk is limited to a pat down for weapons.

In overturning a drug conviction due to lack of reasonable suspicion, the Fourth Circuit expressed "concern about the inclination of the Government toward using whatever facts are present, no matter how innocent, as indicia of suspicious activity." *United States v. Foster*, 634 F.3d 243, 248 (4th Cir. 2011). ("[T]he Government cannot rely upon post hoc rationalizations to validate those seizures that happen to turn up contraband.").

Police cannot conduct an investigatory detention based on reasonable suspicion that a person committed a misdemeanor that poses no threat to public safety. *United States v. Grigg*, 498 F.3d 1070, 1075-83 (9th Cir. 2007)(reported violation of a noise ordinance insufficient to justify stop). "[S]imply driving with out-of-state license plates on a particular stretch of highway where [police say] much drug trafficking occurs" does not amount to reasonable suspicion. *Huff v. Reichert*, 744 F.3d 999, 1004-05 (7th Cir. 2014).

Reasonable suspicion for a frisk must be "something more than an inchoate and unparticularized suspicion or hunch." *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Police cannot frisk an individual without "reasonable suspicion that the subject is 'armed and dangerous'

5

as opposed to being generally suspicious." *United States v. Williams*, 731 F.3d 678, 686 (7th Cir. 2013).

Absent probable cause to arrest, only a brief investigative detention is permitted under a *Terry* stop. An officer's focus must remain on the bases for the traffic stop, in that the stop must be "sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure." *See United States v. Guijon–Ortiz,* 660 F.3d 757, 764 (4th Cir. 2011). A traffic stop that was reasonable at its inception can violate the Fourth Amendment when an officer extends the stop beyond the time reasonably required to complete the mission of issuing a warning ticket. Even a de minimis extension violates the Fourth Amendment. *United States v. Miller*, 54 F.4th 219, 228 (4th Cir. 2022)(internal citations and quotation marks deleted.).

In violation of *Minnesota v. Dickerson*, 508 U.S. 366, 378-79 (1993), the officer shoved his hands into Mr. Jenkins' pockets. Police officers may not seize non-threatening contraband detected through groping and manipulating the object after a protective pat-down revealed no weapons. *Id.* The intrusiveness of a pat-down under *Terry* is limited by its purpose. *United States v. Miles*, 247 F.3d 1009, 1013-15 (9th Cir. 2001) (shaking matchbox exceeded permissible scope of *Terry* frisk).

By shoving his hand into Mr. Jenkins' pocket, instead of frisking him, the officer converted a frisk into an unlawful search. *United States v. Casado*, 303 F.3d 440, 449 (2d Cir. 2002).

1. Mr. Jenkins did not commit a traffic violation.
2. Mr. Jenkins was *de facto* under arrest when he was asked to get out of the car, and he was not free to leave.

3. There was no basis for a *Terry* frisk – there was no evidence that Mr. Jenkins was armed and dangerous, and there was no probable cause for an arrest.

4. There was in fact no *Terry* frisk. There was a search, not a pat down.

Finding contraband in the Defendant's pocket caused the officer to order a search of the car. Without this evidence, there was no "*probable cause* to circumvent the Fourth Amendment's warrant requirement and search the vehicle. . . the automobile exception requires that the police have probable cause (not just reasonable articulable suspicion) to search" a vehicle. *United States v. Davis*, 997 F.3d 1919, 201 (4th Cir. May 7, 2021).

Nor is the search of the car justified as a search incident to an arrest. Police may search a vehicle incident to a recent occupant's arrest if the person is "within reaching distance of the passenger compartment at the time of the search or it is reasonable to believe the vehicle contains evidence *of the offense of arrest*." *Davis* at 201-202, citing *Arizona v. Gant*, 556 U.S. 332, 344, 129 S. Ct. 1710, 1719, (2009) ("Because police could not reasonably have believed either that Gant could have accessed his car at the time of the search or that evidence of the offense for which he was arrested might have been found therein, the search in this case was unreasonable."). Like the defendants in *Davis* and *Gant*, Mr. Jenkins was immediately moved and further secured, away from the vehicle. The search of the car was unreasonable.

There is no question that the encounter between Mr. Jenkins and police was not consensual and that he was seized at the time of the stop. *See e.g., United States v. Jones*, 678 F.3d 293, 305 (4th Cir. 2012)("officers detained Jones before they had any justification for doing so."). There was no justification for a frisk, and the search of Mr. Jenkins was not a mere frisk. Finally, the

search of the car took place without a warrant and not within any exception. All these actions were in violation of the Fourth Amendment and therefore the evidence obtained must be suppressed.

**II.  Counts 4, 5, and 6.**

Counts 4, 5, and 6 of the indictment charge that on April 16, 2020 the Defendant knowingly possessed firearms and ammunition, knowingly possessed with intent to distribute methamphetamine and hydrocodone, and used, carried, and possessed firearms during and in relation to and in furtherance of a drug trafficking crime.

**A.  Statement of Facts**

On April 16, 2020, Colleton County Sheriff's office responded to investigate a report of gunshots heard near Good Hope Boat Landing in Ridgeville, South Carolina. A deputy driving in the area observed two vehicles driving from a road coming from the landing. He stopped one of the vehicles, a 2019 Toyota pickup truck, claiming that the headlights were not on. Alonzo Jenkins was the driver and there were three passengers, Jokashia Pedraza, Shyheme Barnes, and a 15 year old juvenile.

The officer asked for the windows to be rolled down and for everyone to stick their hands out the window, which they did. He asked if anyone knew where the gunshots came from and if they had any guns. He asked for everyone's ID. Mr. Jenkins provided his ID as did the other adults. The juvenile did not have an ID and gave his name and birthday.

The officer later claimed he could see an open duffel bag on the rear seat between the two passengers. He stated that he could see firearms in the duffel bag. He ordered the occupants to exit so he could conduct a search of the truck.

All were patted down, handcuffed, and told they were not under arrest. The officer questioned them, and the truck was searched. Guns were found, and all were arrested with the exception of the juvenile.

**B. Statement of Law – Counts 4, 5, 6.**

The Defendant repeats here as if stated in full, the statement of applicable law submitted in regard to counts 1, 2, and 3, *supra.*

The Constitution requires "*a particularized* and objective basis for suspecting *the particular person stopped* of criminal activity." United States v. Massenburg, 654 F.3d 480, 486 (4th Cir. 2011)(emphasis in the original). "Vague report of shots fired," that a defendant "was found in the general vicinity" of the reported site of the gunfire, and that "this encounter occurred in a high-crime area—also do little to create particularized suspicion." *Id.* at 486. This is especially true when the report is an anonymous tip and not corroborated, and the tip provides no predictive information, or physical description of the perpetrators. *Id.* at 486-488.

Furthermore, shooting a gun in rural South Carolina is not a crime.

Similarly, the officer here did not have a reasonable suspicion, probable cause, or a warrant to stop, arrest or search the Defendant or the truck, nor did he consent. There is no evidence that the vehicle was described or involved in the vague report that shots were fired.

1. Mr. Jenkins did not commit a traffic violation.

2. Mr. Jenkins was *de facto* under arrest when he was asked to get out of the car, and he was not free to leave.

3. There was no basis for a *Terry* frisk – there was no evidence that Mr. Jenkins was armed and dangerous, and there was no probable cause for an arrest.

4. There was in fact no *Terry* frisk. There was a search, not a pat down.

He and the truck were seized, he was removed from the vehicle and placed in custody, and the truck was searched. All these actions were in violation of the Fourth Amendment and therefore the evidence obtained must be suppressed.

**III. Counts 7, 8, and 9.**

Counts 7, 8, and 9 of the indictment charge that on November 4, 2020 the Defendant knowingly possessed firearms and ammunition, knowingly possessed with intent to distribute crack cocaine and methamphetamine, and used, carried, and possessed firearms during and in relation to and in furtherance of a drug trafficking crime.

**A. Statement of Facts**

On November 4, 2020, a Dorchester County Sheriff's deputy that he observed a Silver Nissan with a problem with an expired decal, and speeding. He conducted a traffic stop. Mr. Jenkins was the driver and sole occupant. He provided his driver's license and the registration for the car, which belonged to his mother. He also provided an expired insurance card. He called his mother to get the current insurance card.

The officer stated he could smell the odor of marijuana. He saw an empty jar with green residue. Mr. Jenkins held up the jar and showed him the jar was empty. The officer decided to search the car and asked Mr. Jenkins to exit. The officer continued the search of the car, and the Defendant tried to leave the scene. After he was secured, a further search found 2 guns as well as crack cocaine and methamphetamine in the car.

    **B. Statement of Law – Counts 7, 8, 9.**

The Defendant repeats here as if stated in full, the statement of applicable law submitted in regard to counts 1, 2, 3, and 4, 5, 6, *supra.*

    1. Mr. Jenkins did not commit a traffic violation.

    2. Mr. Jenkins was *de facto* under arrest when he was asked to get out of the car, and he was not free to leave.

    3. There was no basis for a *Terry* frisk – there was no evidence that Mr. Jenkins was armed and dangerous, and there was no probable cause for an arrest.

    4. There was in fact no *Terry* frisk. There was a search, not a pat down.

Officers did not have a reasonable suspicion, probable cause, or a warrant to stop, arrest or search the Defendant or the car, nor did he consent. He and the car were seized, he was taken into custody, and the car was searched. All these actions were in violation of the Fourth Amendment and therefore the evidence obtained must be suppressed.

## IV. Statement of Law as to all Counts regarding the Odor of Marijuana

The odor of marijuana has historically provided police officers with probable cause to search a person or a car in which a person was driving. See *United States v. Palmer*, 820 F.3d 640, 650 (4th Cir. 2016). However, a change in the law about how marijuana is defined must provoke a reconsideration of whether an officer's claim about the smell the "odor of marijuana" still provides probable cause to search a person or his car.

It is time for the courts to ignore police officers' claims that they smell marijuana as some sort of talisman that excuses illegal stops, searches, and seizures. Additionally, the courts must reexamine the legal effect of an officer's claim that he smells the "odor of marijuana" in light of significant changes in the law surrounding marijuana and its twin sister hemp. Not all Courts have countenanced the "odor of marijuana" talisman as a legitimate reason for law enforcement to stop and search citizens. One judge in New York has even called the use of the term a "canard." See Ex 1.

The odor of marijuana, alone, no longer provides evidence of a crime. This is because possession of marijuana has been decriminalized by the federal government, and because both the federal government and the state of South Carolina have decriminalized the possession and use of hemp and cannabidiol (CBD) products—products that smell and present like marijuana.

On October 6, 2022 President Biden issued a proclamation granting pardon for the offense of simple possession of marijuana. Ex. 2. It grants a "full, complete, and unconditional pardon to (1) all current United States citizens and lawful permanent residents who committed the offense of simple possession of marijuana in violation of the Controlled Substances Act." It is retroactive and applies to people who possessed marijuana "on or before the date of this proclamation." The

pardon also reaches those who have convictions, not just committed the offense—"(2) all current United States citizens and lawful permanent residents who have been convicted of the offense of simple possession of marijuana." The pardon is intended to restore those who have possessed marijuana to "full political, civil, and other rights."

In his statement accompanying the proclamation, President Biden acknowledged the movement towards decriminalization of marijuana. Ex. 3. "Sending people to prison for possession of marijuana has upended too many lives and incarcerated people for conduct that many states no longer prohibit." He also pointed out the disproportionate negative impact marijuana has on people of color — "And while white and Black and brown people use marijuana at similar rates, Black and brown people have been arrested, prosecuted, and convicted at disproportionate rates."

Most states have legalized marijuana for medicinal or recreational use.[1] The medical use of marijuana is legal in 38 states. "The recreational use of cannabis has been legalized in 22 states, Guam, the Northern Mariana Islands, the U.S. Virgin Islands, and D.C. Another 9 states have decriminalized its use. Commercial distribution has been legalized in all jurisdictions where possession has been legalized, except for Virginia and D.C."[2]

In June of 2014 Governor Haley signed into law Senate Bill 1035, "Julian's Law," allowing children with severe epilepsy to be treated with CBD oil if recommended by a physician. Although South Carolina has not yet legalized recreational marijuana use, it has decriminalized the possession of hemp and the use of cannabidiol (CBD) products. *See* the South Carolina Hemp

---

1 See https://en.wikipedia.org/wiki/Legality_of_cannabis_by_U.S._jurisdiction (last visited 05/04/2023).

2 *Id.*

Farming Act at S.C. Code Ann. §§ 46-55-10 through 46-55-60. "Hemp plants can be made into anything from rope to insulation to granola. But today, most farmers are growing hemp to produce cannabinoids, such as CBD, which means they're growing plants that look like marijuana, smell like marijuana, and increasingly, are rolled into joints and smoked like marijuana."[3]

The federal government has also legalized the possession and use of hemp and related CBD products. *See* 21 U. S. C. § 802(16) (2019); Agricultural Improvement Act of 2018 Pub. L. No. 115-334, 132 stat. 4490; Agricultural Act of 2014 Pub. L. No. 113-79, § 11009, 128 stat. 649.

Hemp and marijuana are "varieties of the same species, Cannabis sativa L."[4] The main difference is the level of the psychoactive compound cannabinoid delta 9 tetrahydrocannabinol, or THC.[5] The inability to distinguish between the "odor of hemp" (a legal substance to possess) and the "odor of marijuana" has prompted concern from many law enforcement areas across the country about the ability of officers to search based upon the "odor of marijuana." *See* exhibits 4-6.

The inability of drug sniffing dogs (and officers) to distinguish the odor of hemp from the odor of marijuana has prompted concern from law enforcement. For example, in August of 2019, the Florida Times Union in Jacksonville, Florida published an article titled "Florida legalized hemp. Now prosecutors are dropping marijuana charges and retiring dogs." Ex. 5. The article quoted a State Attorney of Florida's Third Judicial Circuit as saying: "The dogs are done. If they're

---

[3] https://www.pewtrusts.org/en/research-and-analysis/blogs/stateline/2020/01/06/cannabis-confusion-pushes-states-to-ban-smokable-hemp.

[4] Gero Leson et al., *Evaluating the Impact of Hemp Food Consumption on Workplace Drug Tests*, 25 J. of Analytical Toxicology 691, 692 (Nov. /Dec. 2001); accord *The Health Effects of Cannabis and Cannabinoids: The Current State of Evidence and Recommendations for Research*, National Academies of Sciences, Engineering, and Medicine, at * 38 & n.6 (2017), available at https://doi.org/10.17226/24625.

[5] *See Evaluating the Impact of Hemp Food Consumption*, at 692.

pot-trained, I don't know how we can ever re-certify them. Unless you're trained in the future in a different way, in my area, every dog is going to be retired."

The President of the Florida Sheriff's Association echoed those concerns in the context of dogs and officers smelling marijuana: "We had a very, very hard bright line up until this point that if a cop walks up to a car and you smell marijuana, well no matter what it was, any amount of THC is illegal, so if you smelled it, that gave you probable cause…You had a hard bright line, period end of story. Now that bright line isn't bright anymore. Now that bright line is something less than that." Ex. 5. It is impossible to tell whether a drug dog is alerting to a legal or illegal substance, and the alert is insufficient to give rise to probable cause.

In short, how does an officer in South Carolina discern the difference between the smell of the legal possession and use of hemp and the illegal possession and use of marijuana? He cannot.

This shifting legal landscape in regard to marijuana and hemp requires this court to reexamine the precedents that generally have upheld stops and searches based upon the "odor of marijuana." Marijuana no longer has a distinct smell that indicates that illegal activity is going on or has been going on. As such, it can no longer serve as a basis for probable cause to search citizens or their cars.

### V. Statement of Law as to all Counts – Prolonging the Stop

Although the Fourth Amendment "contains no provision expressly precluding the use of evidence obtained in violation of its commands," the exclusionary rule forbids the use of improperly obtained evidence at trial. *Herring v. United States*, 555 U.S. 135, 139 (2009) (quoting *Arizona v. Evans*, 514 U.S. 1, 10 (1995)). The exclusionary rule bars the introduction of

both "primary evidence obtained as a direct result of an illegal search or seizure" as well as "evidence later discovered and found to be derivative of an illegality," so-called "fruit of the poisonous tree." *Utah v. Strieff*, 579 U.S. 232, 136 S. Ct. 2056, 2061 (2016).

"Because an ordinary traffic stop is more analogous to an investigative detention than a custodial arrest," courts assess the propriety of a traffic stop under the two (2) prong standard delineated in *Terry v. Ohio*, 392 U.S. 1 (1968). *United States v. Green*, 740 F.3d 275, 279 (4th Cir. 2014). Accordingly, courts consider (1) whether the officer's actions were justified at their inception and (2) whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop. *Id.* (citing *Terry*, 392 U.S. at 20).

"[T]he Fourth Amendment permits an officer to initiate a brief investigative traffic stop when he has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Kansas v. Glover*, 589 U.S. __, 140 S. Ct. 1183, 1187 (2020). Accordingly, the first prong of the *Terry*-based test is satisfied when "it is lawful for police to detain an automobile and its occupants pending inquiry into a vehicular violation." *United States v. Bernard*, 927 F.3d 799, 805 (4th Cir. 2019). "As a general matter, the decision to stop an automobile is reasonable where the police have probable cause to believe that a traffic violation has occurred." *Whren*, 517 U.S. at 810. Individuals may, of course, challenge whether the stop is "legitimate at its inception." *United States v. Bowman*, 884 F.3d 200, 209 (4th Cir. 2018).

The second prong is satisfied when "the seizure is limited to the length of time reasonably necessary to issue the driver a citation and determine that the driver is entitled to operate his vehicle." *Bernard*, 927 F.3d at 805. The acceptable length of a routine traffic stop "cannot be stated with mathematical precision" because courts consider "what the police in fact do" and

whether the officers acted reasonably under the totality of the circumstances presented to them when evaluating the reasonableness of a traffic stop. *United States v. Hill*, 852 F.3d 377, 381 (4th Cir. 2017). Thus, an officer's actions must be reasonably diligent and use "the least intrusive means reasonably available." *Id.* at 381-82.

During a traffic stop, an officer may engage in "ordinary inquiries incident to" the stop, such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *United States v. Rodriguez*, 575 U.S. 348, 355 (2015). But a "seizure for a traffic violation justifies a police investigation of *that violation*." *Id.* at 354 (emphasis added). The tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop and attend to related safety concerns." *Id.* "Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary" to effectuate that purpose." *Id.*

After Mr. Jenkins was stopped, officers unconstitutionally prolonged the stops and failed to take steps to address the alleged infractions. The officers "abandoned the prosecution of the traffic stops and embarked on another sustained course of investigation."

**VI. Any statements made by Mr. Jenkins must be suppressed.**

In *Miranda v. Arizona*, the Supreme Court concluded that "without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely. In order to combat these pressures and to permit

17

a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." *Miranda v. Arizona*, 384 U.S. 436, 467, 86 S. Ct. 1602, 1624 (1966).

"*Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980). Thus, officers must administer *Miranda* warnings (1) after a person is taken into custody or their freedom has been significantly restrained and (2) whenever police should know any words or actions on their part are reasonably likely to elicit an incriminating response from a suspect. *Oregon v. Elstad*, 470 U.S. 298, 309 (1985); *Innis*, 446 U.S. at 301.

Mr. Jenkins' freedom was significantly restrained when he was stopped and questioned, when he was prevented from leaving, and when he was placed in handcuffs. Police questioning, prior to administration of *Miranda* warnings, was reasonably likely to elicit incriminating responses from Mr. Jenkins. Therefore, all such statements must be suppressed.

The test for determining whether an individual is in custody is whether, under the totality of the circumstances, the suspect's freedom of action is curtailed to a degree associated with formal arrest. *Berkemer v. McCarty*, 104 S.Ct. 3138 (1984). In *Orozco v. Texas,* 89 S.Ct. 1095 (1969), the defendant was questioned in his own bedroom, and he was not free to leave. The Supreme Court held that the use of his admissions was obtained in the absence of the required *Miranda* warnings and was a flat violation of the Self-Incrimination Clause of the Fifth Amendment as construed in *Miranda*. *Id.* at 1096-1097.

There is no doubt that the Mr. Jenkins' freedom of action was curtailed, and he was not read his rights. The essence of *Miranda* is that custodial interrogation is inherently coercive.

"By custodial interrogation, we mean *questioning* initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Rhode Island v. Innis,* 100 S.Ct. 1682, 1688(1980) citing *Miranda*.

The concern of the Court in *Miranda* was that the interrogation environment created by the interplay of interrogation and custody would subjugate the individual to the will of his examiner and thereby undermine the privilege against compulsory self-incrimination. *Innis* at 1688-1689.

The police practices that invoke this concern include psychological ploys and techniques of persuasion that amount to interrogation. *Id.* at 1689. The *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term interrogation under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonable likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perception of the suspect, rather than the intent of the police. *Id.* at 1689-1690.

The Defendant was in custody, he was interrogated, and he believed he was required to answer the questions of law enforcement. He was under the complete control and authority of officers who had guns, and who surrounded him.

A heavy burden rests on the government to demonstrate that the Defendant knowingly and intelligently waived his privilege against self-incrimination and his right to counsel. *Miranda* at 1628. The relinquishment of the right must be voluntary in the sense that it was the product of a free and deliberate choice, rather than intimidation, coercion, or deception. The waiver must be made with a full awareness, both of the nature of the right to be abandoned and consequences of

the decision to abandon it. *Moran v. Burbine*, 106 S.Ct. 1135, 1142 (1986).

Mr. Jenkins did not waive his privilege against self-incrimination or the right to counsel. The government bears the burden of proving that any statements made were voluntary and not in violation of due process, by a preponderance of the evidence. *Colorado v. Connelly*, 107 S.Ct. 515, 522 (1986).

The Defendant respectfully reserves the right to make any other arguments in support of this motion which may arise after further evidence is presented.

For these reasons, the Defendant requests that the evidence and statements taken in violation of his rights under the Constitution be suppressed.

Respectfully submitted,

*/s/Ann Briks Walsh*

Ann Briks Walsh, Esquire
Assistant Federal Public Defender
145 King Street, Suite 325
Charleston, SC 29402
Attorney ID# 5102

May 3, 2023